AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of  )
*(Briefly describe the property to be searched  )
or identify the person by name and address)*  )   Case No. **23mj1484**
)
White iPhone 13 Pro Cell Phone  )
Seized as FP&F No. 2023565500021502 Line Item 0001  )
("Target Device 2")  )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Shawna M. Wilson, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shawna M. Wilson, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: 04/26/2023

*William V. Gallo*
*Judge's signature*

City and state: San Diego, California    HON. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Shawna M. Wilson, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Blue Motorola G Stylus Cell Phone
> Seized as FP&F No. 2023565500021501 Line Item 0002
> **("Target Device 1")**
>
> White iPhone 13 Pro Cell Phone
> Seized as FP&F No. 2023565500021502 Line Item 0001
> **("Target Device 2")**

the **Target Devices**, as further described in Attachment A-1 and A-2 and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrants related to the investigation and prosecution of Samuel Alberto MACIAS-Axume and Edwin Gustavo PLEITEZ-Miranda for attempting to transport and move illegal aliens within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

1

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2019 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years.  I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants.  I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern

District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

  a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

  b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

  c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

  d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

4

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On April 21, 2023, Border Patrol Agents G. Whalen, A. Cherry, and Border Patrol Agent- Intelligence (BPA-1) D. Beresiwsky were performing their assigned duties at the Campo Border Patrol Station area of responsibility. Agent Whalen was dressed in full rough duty uniform and was operating a marked Border Patrol vehicle with functioning lights and siren. Agents Cherry and Beresiwsky were dressed in plain clothes with their agency badges clearly displayed and were wearing their exterior ballistic vests with all patches and insignia visible identifying them as Border Patrol Agents while operating unmarked government vehicles with functioning lights and sirens.

12. At approximately 9:52 AM, Campo Station Dispatch advised that a silver-colored sedan was observed picking up suspected undocumented aliens at a location commonly known to Border Patrol Agents as the "Harvey Dennison" and was last seen traveling eastbound on State Route 94 (SR-94). At approximately 10:07 AM, Agent Beresiwsky observed a silver Mercedes sedan traveling east on SR-94 near the community of Campo, California.

13. Agent Beresiwsky ran record checks on the license plate's crossing history. These checks revealed the Mercedes had not been recorded crossing either the border or local Border Patrol checkpoints within the last 24 months, indicating the vehicle had not established a travel pattern of someone who might live in the area or routinely visit the area.

14. Based on the Mercedes fitting the description and matching the route of travel of the vehicle observed picking up suspected undocumented aliens, its travel on a known smuggling corridor in close proximity to the border, its lack of prior travel in the area, and the fact that it was traveling east at a time the westbound Border Patrol Checkpoint was operational, Agent Beresiwsky suspected the Mercedes was involved in an alien smuggling event.

15. At approximately 10:07 AM, Agent Beresiwsky contacted Agent Whalen and provided him with the vehicle description, location, and direction of travel.

16. While receiving this information, Agent Whalen observed the silver Mercedes travel east on SR-94 near his location at a landmark commonly known to Border Patrol Agents as the "Green Store." Because the windows on the Mercedes were heavily tinted, Agent Whalen was not able to see how many occupants were in the vehicle.

17. At approximately 10:09 AM, Agent Whalen ran records checks on a Virginia temporary license plate. Campo Dispatch advised Agent Whalen that the license plate had no record on file. In Agent Whalen's experience, smugglers often use mis-plated vehicles to evade detection by law enforcement. As the Mercedes arrived at the intersection of SR-94 and Buckman Springs Road, the vehicle slowed down to almost a complete stop, as if the driver was unsure of what direction to go. After the pause at the intersection, the Mercedes drove north on Buckman Springs road. As Agent Whalen was following the Mercedes, he noticed the driver was continuously riding the brakes and making sure his speed was below the posted limit.

18. At approximately 10:19 AM, Agent Whalen initiated a vehicle stop on the Mercedes on Buckman Springs Road, just north of the Mountain Empire High School. Initially, the Mercedes pulled over but as Agent Whalen was about to exit his vehicle, the Mercedes took off at a high rate of speed. Agent Whalen advised dispatch that the Mercedes had failed to yield.

19. In anticipation that the Mercedes might fail to yield, Agents Cherry and Beresiwsky responded to the north end of Buckman Springs Road and had set up Vehicle Immobilization Devices (VID). Agent Cherry observed the Mercedes travel at a high rate of speed towards his location. Agent Cherry deployed the VID and the Mercedes made positive contact with the device.

20. As Agent Whalen continued to pursue the Mercedes, he observed the vehicle travel through the stop sign at the intersection of Buckman Springs Road and Old 80

6

Highway without slowing down. Agent Cherry was able to catch up to Agent Whalen, joining the pursuit of the Mercedes. The Mercedes then entered Interstate 8 and continued west. At approximately 10:22 AM, a half a mile west of the Buckman Springs offramp, the Mercedes yielded due to the deflation of its tires

21. Agents Whalen and Cherry conducted a vehicle stop on the Mercedes approximately 15 miles east of the Tecate Port of Entry and 12 miles north of the US/Mexico international boundary. Agent Whalen identified himself as a Border Patrol Agent and ordered the driver, later identified as the defendant, Samuel Alberto MACIS-Axume, to exit the vehicle. After placing MACIS in custody, Agent Whalen approached the vehicle and observed three individuals in the backseat dressed in camouflage and an additional individual in the front passenger seat.

22. Agent Whalen identified himself as a Border Patrol Agent and conducted an immigration inspection on all occupants in the vehicle. The three individuals in the back seat, later identified as material witnesses Jhonatan CASTANEDA-Acuna, Rigoberto CRUZ-Velasco, and Alejandro OCADIZ-Ramirez, stated that they are citizens of Mexico without immigration documents allowing them to enter or remain in the United States legally. The front seat passenger, later identified as the defendant, Edwin Gustavo PLEITEZ-Miranda, stated that he is a citizen of El Salvador without immigration documents allowing him to enter or remain in the United States legally. At approximately 10:25 AM, Agent Whalen placed MACIS, PLEITEZ, CASTANEDA, CRUZ, and OCADIZ, under arrest.

23. At the time of arrest, a blue Motorola G Stylus Cell Phone (**Target Device 1**), was found on MACIAS's person and a white iPhone 13 Pro Cell Phone (**Target Device 2**), was found on PLEITEZ's person. MACIAS claimed **Target Device 1** as his, and PLEITEZ claimed **Target Device 2** as his.

24. On Friday April 21, 2023, defendant Samuel Alberto MACIS-Axume was read his Miranda rights. MACIS stated he understood his rights and was willing to speak

to agents without an attorney present. MACIS stated the vehicle he used in today's event belonged to the father of the passenger, who is his friend. MACIS stated he found a job ad online offering money to pick up objects and deliver them. MACIS stated he was unaware he was picking up undocumented people. MACIS stated on morning of April 20, 2023 at approximately 11:00 AM, he and his friend began heading toward the location he was receiving via phone. MACIS stated when he arrived at the location three people jumped into the rear seats of the vehicle. MACIS stated at this moment he realized the people who got in were undocumented people. MACIS stated he did not tell anyone to buckle their seat belts before he began driving. MACIS stated after picking up the people he was waiting for a drop off location to be sent to him via phone. MACIS stated while driving he noticed a Border Patrol Unit behind him and when the unit turned their lights and siren on to pull him over, one of the passengers in the rear seat told him to not stop and continue driving. MACIS stated he was afraid because of the situation and decided to not stop and continue driving at a high rate of speed to try to get away from the officers. MACIS stated he was aware that driving at a high rate of speed could be dangerous and he could cause serious harm or death to the passengers. MACIS stated he would receive between $1,500 or $2,000 dollars if he successfully delivered the people.

25. On Friday, April 21, 2023, material witnesses, Jhonatan CASTANEDA-Acuna, Rigoberto CRUZ-Velasco, and Alejandro OCADIZ-Ramirez, stated they are citizens of Mexico without any immigration documentation allowing them to enter or remain in the United States legally. CASTANEDA, CRUZ, and OCADIZ stated smuggling arrangements were made prior to entering the United States. CASTANEDA, CRUZ, and OCADIZ stated they were going to pay approximately $1,000 to $9,000 USD if successfully smuggled into the United States. CASTANEDA, CRUZ, and OCADIZ stated they crossed the border through an unfenced area.

26. CASTANEDA and CRUZ stated they began making their way to the U.S. while following the foot-guide. CASTANEDA stated they walked for hours and reached

Highway 94. CASTANEDA stated the foot-guide showed them a picture of the load vehicle and then turned back south. CRUZ stated the foot guide's name as "Bola", who took them to an area overlooking the highway where they needed to wait for the load vehicle. CRUZ stated Bola showed him a picture of the load vehicle, a brown four door Mercedes. Cruz stated when instructed by Bola, he and the other members of the group ran to the road where a dark grey Mercedes was approaching. CASTANEDA stated they hid for approximately an hour before a brown Mercedes Benz approached their location and stopped. CRUZ stated that he was the second person to enter the vehicle and sat in the middle back seats between the driver and passenger. CASTANEDA stated there was a driver and a co-pilot inside the vehicle. CASTANEDA and CRUZ described the driver as a young male who had brown skin, short black hair, a green shirt, sweatpants, and spoke Spanish. CASTANEDA described the co-pilot as a younger male who had curly black hair, was light skinned, was wearing jeans, and had on a white/blue shirt. OCADIZ stated he and the two men started making their way to the U.S. and did not have a foot-guide with them. OCADIZ stated the two men knew where to go because they had taken the same route in their previous apprehensions. OCADIZ stated they reached the U.S. side and hid near a main road for approximately 30 minutes. OCADIZ stated one of the men was told an SUV was going to pick them up but was then told via phone that a brown vehicle would be picking them up. OCADIZ stated the driver was young, had no facial hair, was light-skinned, and had short black hair. OCADIZ stated the passenger had curly black hair, a little facial hair, and was light skinned.

27.   OCADIZ stated a 4-door brown vehicle arrived at the main road and stopped. OCADIZ stated there was a driver and a passenger in the vehicle. OCADIZ stated the driver opened the trunk for them so that they could put their bags in there, but they did not. CASTANEDA, CRUZ, and OCADIZ stated the driver told them in Spanish to get inside the vehicle and to duck down because there were patrol cars around.

28. CASTANEDA stated they drove for approximately an hour before they spotted Border Patrol vehicles and heard sirens. CASTANEDA stated he heard the driver ask the co-pilot if he should stop or drive off and the co-pilot told the driver to drive off. CASTANEDA stated he saw a Border Patrol Agent throw spikes on the road and that the spikes popped two tires. CASTANEDA stated the driver kept driving even though he knew the vehicle's tires were popped by the spikes. CASTANEDA stated he was scared and nervous but did not fear for his life. CASTANEDA stated the vehicle stopped and Border Patrol Agents approached the vehicle and asked them questions regarding citizenship. CRUZ stated while traveling in the vehicle he heard the sirens of what he thought was law enforcement and stated that the driver began to pull over. CRUZ stated the passenger told the driver in Spanish to just keep going. CRUZ stated the car picked up speed and sped away. CRUZ stated he was never instructed to put on his seat belt and claimed he was not wearing it while the vehicle was attempting to avoid law enforcement. CRUZ stated he noticed the tires of the vehicle going flat. CRUZ stated the vehicle eventually came to a stop and were told by the driver and passenger to run away if they wanted to. CRUZ stated they just waited in the car. OCADIZ stated they drove for approximately 40 minutes before he heard the driver ask the co-pilot if he should stop or keep driving. OCADIZ stated the co-pilot told the driver to drive off. OCADIZ stated he heard sirens and felt the vehicle accelerate in speed. OCADIZ stated he heard the tires of the vehicle pop. OCADIZ stated he was scared but did not fear for his life. OCADIZ the vehicle stopped, and they were taken out of the vehicle by Border Patrol Agents and cuffed.

29. CASTANEDA and CRUZ were shown a photographic lineup of six individuals, including the co-pilot of the vehicle, Edwin Gustavo PLEITEZ-Miranda, who was photo lineup #4. CASTANEDA and CRUZ were able to positively identify him as the passenger of the Mercedes who told the driver to flee from law enforcement.

30. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and

10

opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **March 21, 2023, through April 21, 2023**.

## METHODOLOGY

31. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic

data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

32. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

33. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

34. Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

## CONCLUSION

35. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Section 1324.

36. Because the **Target Devices** were seized at the time of MACIS and PLEITZ's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **March 21, 2023, through April 21, 2023.**

37. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1 and A-2 seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Shawna M. Wilson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26th day of April 2023.

_William V. Gallo_
HON. WILLIAM V. GALLO
United States Magistrate Judge

13

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

White iPhone 13 Pro Cell Phone
Seized as FP&F No. 2023565500021502 Line Item 0001
(**"Target Device 2"**)

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.  The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **March 21, 2023, through April 21, 2023**:

- a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

- b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

- c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

- d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

- e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

- f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.